**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TURAN PETROLEUM INC., (a Delaware corporation); ENERGYFUND INC. (a District of Columbia corporation); TRUSTEES FOR TREK RESOURCES INC. (a Nevada corporation)<br><br>    Plaintiffs<br><br>v.<br><br>MINISTRY OF OIL AND GAS OF KAZAKHSTAN (agency of Republic of Kazakhstan)<br><br>and DOES from 1 to 100<br><br>    Defendants | CIVIL ACTION No.<br><br>**COMPLAINT**<br><br>**FOR ORDERS, DECLARATORY JUDGMENT, DAMAGES AND OTHER RELIEF BASED ON:**<br><br>**1. BREACH OF CONTRACT;**<br>**2. VIOLATION OF RIGHTS UNDER TREATY AND INTERNATIONAL LAW (EXPROPRIATION);**<br>**3. BREACH OF FIDUCIARY DUTIES;**<br>**4. UNJUST ENRICHMENT;**<br>**5. MISREPRESENTATION;**<br>**6. NEGLIGENCE;**<br>**7. DECLARATORY RELIEF**<br><br>**28 U.S. CODE § 1605**<br>**('General exceptions to the jurisdictional immunity of a foreign state')** |

## I.  NATURE OF ACTION

This is an action brought pursuant to 28 U.S.C. Section 1605 ('General exceptions from jurisdictional immunity of a foreign state') and other applicable law.

## II.  PARTIES

1.      Plaintiff TURAN PETROLEUM, INC. is a corporation organized and existing under the laws of the State of Delaware, with registered address: 16192 Coastal Highway, Lewes, Delaware, 19958.

2.      Plaintiff ENERGYFUND, INC. (hereinafter also "EnergyFund") is a corporation organized and existing under the laws of the District of Columbia, with registered address: 1090 Vermont Ave., NW, Suite 910, Washington, D.C., 20005.

3.      Plaintiffs Trustees for TREK RESOURCES, INC. (hereinafter also "Trek") are the managers of EnergyFund, with offices at the same address as above. EnergyFund is the assignee of the rights of Trek, after Trek was in default by the State of Nevada.  The latest address of Trek was: 502 North Division Street, Carson City, NV, 89703.  Trek's original stock certificates were converted, through use of duplicates, from their lawful owners who hold Trek's original stock certificates. Trek's rights are asserted by its assignee EnergyFund, Trek's successor in rights.

4.      Defendant MINISTRY OF OIL AND GAS OF KAZAKHSTAN (hereinafter also the "Ministry") is a government agency of the Republic of Kazakhstan, with main offices at: 19 Kabanbai Batyra Ave., Astana, 010000, Kazakhstan.

5.      As a result of the government reorganization in Kazakhstan in March of 2010, the above Ministry was created to replace the former Ministry of Energy and Mineral Resources of Kazakhstan.  Pursuant to the Ordinance of the Cabinet of Ministers No. 454 of May 20, 2010, the new Ministry became the successor in rights and obligations of the former Ministry which was then abolished.  For purposes of this complaint, the Ministry should be understood as referring to that government agency with its present name and organizational form, as well as to its predecessor under the name Ministry of Energy and Mineral Resources, both at the same address in Kazakhstan.

## II.  JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action and over the defendant pursuant to 28 U.S.C. §1605 ('General exceptions to jurisdictional

1

immunity of a foreign state'). The statutory exceptions from the sovereign immunity

apply, within the meaning of the "commercial exception", particularly the "expropriation

without compensation" and because of other commercial effect and damages in the U.S.

Additionally, the "waiver" exception applies to the facts herewith. Jurisdiction is proper

inasmuch as §1605 invokes the federal law question within the meaning of 28 U.S.C.

§1331.

     **7.**     Jurisdiction is also proper because of the diversity of citizenship pursuant

to 28 U.S.C. §1332. Plaintiffs are citizens of the District of Columbia and of the State of

Delaware, and defendant is a governmental agency of Kazakhstan. The amount in

controversy, exclusive of interest and costs, is in excess of the statutory $75,000

minimum.

     8.     This District Court also has proper jurisdiction because one of the

plaintiffs, EnergyFund, is a corporation existing under the laws of the District of

Columbia.

     9.     Since 1992, Kazakhstan has undertaken the obligations under the Treaty

between the USA and Kazakhstan Concerning the Encouragement and Reciprocal

Protection of Investment. Kazakhstan's obligations under that Treaty have been

disregarded by the Ministry in this particular matter, within the meaning of 28 U.S.C.

§1605.

     10.     Pursuant to Article XII of said Treaty, the "…Treaty shall apply to the

political subdivisions". The obligations of a sovereign country under that Treaty apply to

the Ministry.

     11.     To the extent the Ministry is incorporated as a government entity in

Kazakhstan, any District Court, including this District Court, has jurisdiction and venue

pursuant to the 'alien' clause of 28 U.S. Code §1391(d), whereas aliens (including foreign corporate entities) may be sued in any District.

12.     Venue is proper because one of the plaintiffs, as mentioned above, is a corporation under the laws of this District.  Furthermore, Kazakh officials repeatedly made statements in Washington, D.C. to encourage American investments and generally western investments into the economy of Kazakhstan, on which statements plaintiffs relied.  Additionally, the Embassy of the Republic of Kazakhstan was a conduit for the Kazakhstan's official statements on the protection of American investments in Kazakhstan.

### III.  UNDERLYING FACTS

A. Circumstances Underlying Setting Up of the Aral and the Arys Concessions

13.     After gaining its independence in 1992, Kazakhstan embarked on attracting western investments into its economy.  Encouraging foreign investments, including from North America, became a priority in Kazakhstan's foreign policies.

14.     Among its very first steps in international relations, in May of 1992 Kazakhstan entered into an agreement with the U.S., entitled the Treaty between the USA and Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment (hereinafter also the "Treaty").  That Treaty entered into force in January of 1994.

15.     Shortly after signing that Treaty, on July 23, 1992, Kazakhstan also signed the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, with the Secretariat in Washington D.C.  That Convention entered into force for Kazakhstan on October 21, 2000.

16.     While having limited available investment capital base of its own, Kazakhstan started to propose to western investors concessions for exploration of oil and

gas reserves.  Pursuant to their proclaimed purposes, those concessions were to preview a 25-year term, during which an investor would be entitled to explore the subsurface reserves, to produce oil and gas and to export the oil and gas products extracted within the concession territories.

17.     In 1994 Kazakhstan enacted an act, known as the Foreign Investment Law.  As amended in 2003, that act, No. 373-II, proclaimed: "Republic of Kazakhstan guarantees the stability and conditions of contract concluded between investors and state bodies of the Republic of Kazakhstan"

18.     In the course of that promotional campaign to attract western investments, the Ministry made various public offers and announced biddings for those oil and gas concessions.  Kazakh officials made various representations, including in Washington, D.C., claiming that investments are safe in Kazakhstan.

19.     In fact, the oil and gas concessions, proposed by the Ministry, involved a substantial financial exposure for western investors.   Kazakh authorities did not participate in any investments, only signing off the concessions agreements, but making various requirements.  Kazakh authorities made various declarations about protecting investors, to assuage the concerns that substantial investments were required to be made upfront, whereas the availability of the oil and gas deposits within the concession territories was unknown.

20.     Among various other Kazakh agencies, the Ministry consistently made representations—specifically targeted at U.S. and Canadian entities that provided the lion's share of incoming investments-- that such western investments were safe.  Those statements implied the guarantees against a possibility of any expropriation, at a minimum the guarantees that no expropriation could occur without proper compensation.

In fact, assurances that no expropriations of foreign investments would be allowed became a prominent point in the Ministry's public declarations.

21.     As a part of its policy of encouraging investments from North America and from other western countries, Kazakhstan also adopted, in January of 1996, the Act on Use of Subsurface Resources, statute No. 2828.  That Act's Article 3.3 proclaims that generally "Foreigners and foreign corporations… enjoy the rights and bear responsibilities with regard to use of mineral resources on the same basis as citizens and corporations registered in Kazakhstan…"

22.     As it turned out, however, in reality, on more than fifty occasions, Kazakhstan used those oil and gas concessions to attract western investments and then to repudiate such concessions, by using various pretexts.  As a result, such steps by the Ministry were, in fact, aimed at confiscating the investments actually made by western investors, without the intention to compensate western investors.

23.     The subject matter of this action is the consequences of the Ministry's repudiating its obligations under two oil and gas concessions, allocated in the Southern part of the territory of Kazakhstan, known as the "Aral Concession" and the "Arys Concession".  Those concessions were largely funded through the investments originated from the North American sources, based on their know-how, expertise, consulting and other non-monetary investments.

24.     The plaintiffs in this action are connected, through contractual, joint venture and loan arrangements, consortium and pool arrangements, participation in stock, mutual claims and settlements, with a number of other North American companies that provided the funding, the know-how, consulting, and experts' work.

25.     Those investments fall under the broad definitions of investments and their forms previewed by the 1993 Treaty.   Those investors include Wedge Energy International Inc., its assignee Desiree Resources Inc. (both Canadian), Turan Petroleum Inc., NRG Resources Inc. (both State of Nevada), International Energy Foundation Inc. (State of New York), Maxioil Ltd. (State of Massachusetts), without limitation.

26.     These North American entities operated through, and were related to, a number of local entities in Kazakhstan, including by way of a parent-subsidiary relationship, joint ventures, partnerships, through loan and consortium arrangements, and sometimes through overlapping management.  That included Kazakh counterparts Ai Dan LLC, Kok Aral Munai LLC, TuranEnerPetroleum LLC, NG Enercom LLC, and other entities in Kazakhstan.

27.     Summarizing the totals, investments made from or through the North American investors, exceeded for these two Concessions $30 million.  The profits that the investors expected to derive from both Concessions, pursuant to various valuations and subject to the confirmation of the seismic data, were to exceed $150 million.

28.     By way of a context, the disputes arising from the confiscation by Kazakh agencies of foreign investments without compensation are neither new nor exceptional. For example, in the latest instance, in March of 2010 the International Center for Settlement of Investment Disputes in Washington, D.C., confirmed an award of $125 million to Turkish investors (ARB #5/16; stock in a local cellular telephone company converted by Kazakh authorities).

B. The Aral Oil and Gas Concession

29.     In 2001, the Ministry circulated an offer of a concession to explore oil and/or gas deposits and to materialize their extraction, to be known as the Kok-Aral

Concession.  The territory under the Concession was situated within Aralsk district of Kyzylorda region of Kazakhstan, including peninsulas Bolshie Barsuki and Karatup in the Aral Sea (currently a salt water lake without an access to the ocean).  The Aral Sea, whose surface is constantly shrinking due to a continued drop of the salt water level, is situated on the border between Kazakhstan and Uzbekistan.

30.     The total territory allocated for the Aral Concession was ca. 2,397 sq. kilometers or 592,460 acres.  Because almost the entire territory of that Concession was adjacent to the Aral Sea, the concession was to be known, in a simplified manner, as the "Aral Concession".

31.     The Ministry initially concluded the concession agreement with a Kazakh entity called Ai Dan LLC (hereinafter "Ai Dan"), with offices at: Auezova St. 17, Kyzylorda, Kazakhstan.   Under the agreement concluded by Ai Dan LLC with the Ministry on June 29, 2002, government registration No. 979, the term for exploration was determined to be 6 years, with the automatic extension for 25 years for the subsequent oil and gas production.  The agreement previewed from Ai Dan a $1.2 million subscription bonus or undertaking.

32.     Upon the conclusion of the agreement, Ai Dan created a fully owned subsidiary, called Kok Aral Munai LLC (hereinafter "KAM"), in Almaty, Kazakhstan. KAM was set up for that project to replace Ai Dan, its parent, in that concession agreement.

33.     The Agreement with the Ministry was amended on December 29, 2002, by way of concluding a supplement to the Agreement, under the government registration No. 1080.  Under that amendment, the rights under the agreement passed to KAM.

34.     The statutory capital of KAM was about $2 million, which accounted for the $1.2 million subscription bonus and $0.8 million investments.   Ai Dan then transferred the rights under the Aral Concession from its subsidiary KAM to its other subsidiary Munaisystem Inc.   The latter was ultimately acquired by another Kazakh entity, NG Enercom LLC ("NG Enercom").   In fact, all these Kazakh entities were interrelated.

35.     The above Kazakh parties began to negotiate and later make financial and other arrangements for investments in the USA.   That included work on the arrangements with NRG Resources, Inc., a Nevada corporation incorporated in 2001, involved in a range of oil products (also previously known as NRG Laboratories, Inc.)   That also included the negotiations with International Energy Foundation, Inc., a New York not-for-profit corporation. [The present name; the original name of that corporation in 1997 was International Forum for Investments in Uzbekistan, Foundation, Inc., which was changed in 2001 into World Foundation for Reconstruction and Development, Inc.]

36.     In the subsequent time, the above group of companies made investments in the Arys Concession exceeding $2 million.   Additionally, there was a substantial input of work of experts, including experts holding Ph.D. and masters' or professional degrees, which subsequently remained unpaid for, whose value was estimated at over $1 million.

37.     Despite the progress of works on the Aral Concession, on February 18, 2005 the Ministry issued an Order, by which it suspended the Aral Concession for one month, claiming a non-performance by KAM.   The Ministry's claim of non-performance was unjustified, because it accounted only for cash flow in Kazakhstan.  The Ministry did not take into consideration, among other things, the unpaid work of experts (value exceeding $1 million), as well declined to account for any transactions outside of

Kazakhstan.  The Order was not specific nor addressed the issues deriving from the Aral Concession factual implementation.

38.     On July 5, 2005, the Ministry issued the Order No. 979, by which it terminated the June 2002 agreement on the Aral Concession altogether.  Likewise, the Order was not specific nor did it address the real circumstances.  The Order did not account for any investments that did not show as cash payments on the bank statements in Kazakhstan.

39.     That simplistic, but self-serving approach of the Ministry that repudiated the Aral Concession was not justified.  For example, Kazakh banks were not reliable for handling transactions other than the minimal local operative disbursements, and foreign investments required more time.  As a part of the investments and seismic work already made, one exploratory oil well was subsequently drilled within the Aral Concession territory, identified as the 1P-Aral well.   That exploratory oil well did not produce oil, but helped develop further seismic and geological information.

40.     KAM attempted to restore the Aral Concession rights in Kazakh courts.  However, the Ministry had a certain advantage in the national courts, and the local litigation by a Kazakh entity has been futile.

41.     As a result of the termination of the Aral Concession, KAM and its foreign counterparts in the U.S. and elsewhere, including those enumerated above, incurred substantial investments.  None of those investments were compensated by the Ministry to date.

42.     As a spin-off of that termination, litigation followed in the U.S., with the first case in the U.S. brought in July of 2006 by NRG Resources Inc. against several

parties, No. 06cv4591, in the U.S. District Court for the Central District of California, followed by several cases both in the federal and in the state courts.

43.     In the course of the investors' contacts in Kazakhstan through the principals of NG Enercom and other Kazakh entities, however, an understanding was reached that investments made within the Aral Concession could be recouped through the Arys Concession (described below), acquired by certain members of the same group of investors.  Therefore, in light of the Ministry controlling both concessions, the investors postponed filing the claims against the Ministry in the U.S. at that time.  Filing claims was deferred by necessity, not to derail the prospective of the Arys Concession, which was estimated to contain greater deposits of oil and gas.

C. The Arys Oil and Gas Concession

44.     In 2001, the Ministry offered a Concession Agreement for the exploration and development of the oil and gas resources on the territory of approximately 22,000 sq. kilometers or about 5 million acres in Shymkent and Kzylorda regions in Kazakhstan, identified here as the Arys Concession.

45.     By comparison with the Aral Concession, the Arys Concession covered the territory almost 10 times larger.

46.     Various geological surveys and seismic tests in Kazakhstan have provided reasonably reliable indications that the estimated reserves of oil and gas within the Arys Concession territory may contain up to 2.5 billion barrels of crude oil.  Geological studies have located over 50 geological formations on that territory that are typically oil or gas bearing.

47.     Under the scenario that geological studies would be confirmed, the value of the untapped oil within the Arys Concession territory may exceed $2 billion, in current

oil prices, with relatively low costs in Kazakhstan. The duration of the Government's Concession, 25 years, allowed to extract that volume and to generate profits ultimately to exceed $1 billion, which are conservatively stated at $150 million for purposes of this action.

48.     The Ministry concluded the initial agreement on the Arys Concession with a Kazakh entity Aral Petroleum LLC ("Aral Petroleum"), under government contract No. 753. In late 2003, Aral Petroleum and a group of Kazakh entities associated with the Aral Concession, engaged in a series of barter transactions with a Kazakh entity NG Enercom, which was connected to American investors. Namely, NG Enercom principals proposed to Aral Petroleum to acquire one oil and gas concession for $10 million or in a swap with other assets, which later in fact took place. The value of that transaction for that acquisition was independently established when subsequently one of the concessions held by Aral Petroleum was valued in excess of $10 million and sold.

49.     In that manner of swap of assets and mutual settlements, in late 2004, Aral committed to transfer to NG Enercom the rights under the Arys Concession. Aral Petroleum was later acquired by NG Enercom, including the rights in the Arys Concession.

50.     Pursuant to these arrangements, in May of 2004, Aral Petroleum created a 51/49% joint venture with KEC. Both entities transferring the rights under the Concession to a newly incorporated TuranEnerPetroleum LLC (hereinafter "TEP"). In that transaction KEC reserved the option of a first buyer of Aral Petroleum's 51%.

51.     In October of 2004, the new owners of the rights to the Arys Concession negotiated in the U.S. the scenarios for funding the geological, seismic and drilling

works.   Among the initial negotiating parties, there was American Heritage Funding LLC, incorporated in Nevada, and other American corporations.

52.   As a result of those negotiations, two Nevada corporations were set up for generating investments for the Arys Concession in the U.S., Canada and elsewhere.

53.   Out of these two, Turan Petroleum, Inc. was incorporated in Nevada (hereinafter "Turan-NV") on December 28, 2004, by way of reinstating Elite Registry Inc., previously incorporated in Nevada in March of 2001.

54.   Additionally, on April 19, 2005, Trek Resources Inc. ("Trek") was incorporated in Nevada.  Trek received, along with one of its managers, 54% of stock in Turan-NV.  That interest was stated within the four corners of the certificates of stock, memorializing Trek's 54% interest in Turan-NV.  By July of 2005, the change of the parent entity of TEP, i.e. Aral and KEC, replaced by Turan-NV, was registered by the Ministry of Justice of Kazakhstan.

55.   Turan-NV engaged in raising capital in the U.S. and in contracting with operators for seismic and other work for the Arys Concession.  That included proceeds from several dozens American investors, both corporate investors and individual investors.

56.   For example, one of the investors was Terralliance Technologies, Inc. ("Terralliance"), a California corporation founded by NASA engineer Erlend Olson, backed by venture firm Kleiner Perkins Caufield & Byers and by Goldman Sachs. Terralliance specialized in oil exploration using the computer technology processing the data of air mapping.

57.   Terralliance made through Turan-NV capital investments in six wire transfers, i.e. on February 15, July 3, 9 and 18, December 12, 2006, as well as on April

24, 2007, for the total of about $5,156,793.   Additionally, Terralliance made cash infusion by checks, between August of 2006 and October of 2007, for the total of about $884,022.   The total of the investments made by Terralliance amounted to about $6,040,816.

58.     Another investor, Wedge Energy International Inc. ("Wedge"), a Canadian corporation, headquartered in Ottawa, Canada, invested, through its Kazakh counterparts and Turan-DEL (see below), about $3,050,000.   Those investments were in part from its own assets and those of its shareholders and in part using the corporate loans from American funding entities and hedge funds, located in New York City.   Its rights deriving from the investments made were subsequently acquired, as an assignee, by another Canadian corporation, Desiree Resources, Inc., located in British Columbia, Canada.

59.     As another example, a metal processing enterprise in California, invested in 2008 about $3.8 million.   There were numerous other investors in North America, who invested in the Arys Concession.

60.     As mentioned above, Trek's rights in the Arys Concession were the result of the transactions, involving the swamp of the assets, with the total value of over $10 million.

61.     Furthermore, investments included the work of experts who were involved by the North American investors.   Because of their interest in the Arys Concession the experts' fees were deferred for later time and ultimately were not paid for.   Various experts held various science degrees recognized as the prerequisites for work as experts. The total value for such unpaid expert work on that concession exceeded $3 million.

62.     All those investments also became the accounts payable and all of those accounts payable have been the responsibility of the Ministry in the event it repudiated the agreement on the Arys Concession.

63.     In the course of Turan-NV's operations, it turned out that the initial management of Turan-NV was, however, involved in improprieties with the funds provided by investors, in violation of the certain statutes and regulations.

64.     Several additional lawsuits were initiated in the U.S. District Courts and in the State Courts of California and Nevada, with the various claims against the former management of Turan-NV.  Some of those lawsuits were settled and some are pending or on appeal.  Additionally, in April of 2009 the Department of Corporations of the State of California made an injunctive order against the former management of Turan-NV, on the basis of its violation of the State securities' laws.  These administrative and civil actions have not been completed or resolved at the time of the present complaint.  Those proceedings have no bearing as to the investments actually made.

65.     In light of the above factors, on February 19, 2009 a general meeting of Turan-NV was noticed in advance and held.  The general meeting elected the new management of Turan-NV, based on the 54% control held by Trek in Turan-NV.  However, the previous management of Turan-NV declined to surrender their positions and continued to operate in the name of Turan-NV.

66.     In that regard, to secure the proper accounting, the new management resolved to establish Turan Petroleum, Inc. in the State of Delaware (hereinafter "Turan-DEL") and to convert the Nevada corporation into a Delaware corporation, to lawfully reregister stock and streamline the corporate records.

67. On July 28, 2009, plaintiff Turan-DEL was registered in the State of Delaware, registration No. 47144-12, with the conversion of control over the management rights and for purposes of accounting. That conversion was authorized under the laws of Nevada NRS 92A §§105, 120, 200, 205, 220, 250 and Title 8 'Corporations', Chapter 1 'General Corporation Law' of Delaware, §265.

68. The authority of a new management of Turan-NV and the conversion of the Nevada corporation into a Delaware corporation have been contested by the previous management of Turan-NV. The management rights and corporate control have been subject to litigation in the State of Nevada, since August of 2009. The State court in Carson City, Nevada, made an ex parte ruling declaring the authority of the new management and the conversion ineffective. However, that disposition was appealed from and is currently on appeal before the Supreme Court of Nevada.

69. The position of the new management of Turan-NV and of the management of Turan-DEL was vindicated by a civil lawsuit filed in July of 2010 by the Department of Corporations of California against the former management of Turan-NV. As mentioned above, although, all these proceedings between various parties in the American courts are immaterial for asserting the claims against the Ministry.

70. Regardless of the ultimate outcome which Board of Turan-NV is vested with the full corporate authority, in light of the general shareholders' meeting on February 19, 2009, Turan-DEL, Trek and EnergyFund control 54% of the authorized capital in Turan-NV, and they exercise the rights with regard to investments made through Turan-NV pursuant to that authority.

71. One of the litigious issues in the U.S. was the contested sale in February of 2009 of a 20% interest in the Arys Concession to a Seychelles entity, named Asia Pacific

Oil & Gas Ltd.  However, that entity operated and held its assets in the U.S., namely at Wells Fargo Bank.

72.     Despite the internal corporate disputes and litigation in the U.S. that spread over several cases in the federal and State courts, the investments from the U.S. into the Arys Concession continued.  In the latest instance, in February of 2009, $3.5 million was transferred to Kazakhstan to fund the drilling of an oil well.

73.     That first oil well within the Arys Concession was drilled from June to October of 2009.  Despite the fact that the well did not yield oil, important geological information was obtained, laying ground for further well drilling.

74.     On numerous occasions, representatives of the North American investors advised the Ministry of the ongoing litigation in the U.S. and requested to extend time for exploration and for oil drilling in the Arys Concession beyond the originally scheduled plan.  In particular, those representatives provided information on the status of litigation and explained that investments are handicapped by the ongoing litigation. As argued, those cases may be considered as *force majeur*, justifying the extension of time for drilling more oil wells.  However, the Ministry paid little or no attention to the objective circumstances.

75.     On or about September 24, 2010, the Ministry made a unilateral decision to terminate the Arys Concession.  It did not provide any suspension period of time, as it was the case with the Aral Concession.  On information and belief, the Ministry had a motive to give the Arys Concession to some other entities.

76.     By way of repudiating the Arys Concession, however, the Ministry did not provide any arrangements for a fair market value compensation for all the investments made into the Arys Concession.  The Ministry essentially took an unacceptable position

that it owed to investors nothing, in violation of the 1993 Treaty, of the norms of the international private law, of the basics of the law of contract in almost every jurisdiction.

77.     Various representatives of investors thus requested to promptly restore the Arys Concession.   In light of the denial by the Ministry and its unwillingness to determine the proper compensation or to negotiate the commercially sound terms for winding down the Arys Concession, with the restructuring of the rights in the 2001 contract, this action ultimately became indispensible.

D. Assertion of Jurisdiction over Ministry as Foreign Government Agency

78.     As cited above, this Court has jurisdiction over the Ministry pursuant to 28 U.S.C. §1605 ('General exceptions to jurisdictional immunity of a foreign state').   The statutory exceptions apply to this action within the meaning of the "commercial exception", with the particular emphasis on the "expropriation without compensation".

79.     Among other exceptions from the sovereign immunity, the clause of §1605(a)(2) applies, when a foreign sovereign's act outside the territory of the U.S. occurred "in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States".

80.     To the extent that the Ministry promoted the oil and gas concessions on the international markets and agreed to the participation of, *inter alia*, American corporations as parents to the local entities holding the rights under the concessions, the "waiver" exception also applies.   Within the meaning of §1605(a)(2), that clause applies when "the foreign state has waived its immunity either explicitly or by implication".   For example, the Ministry of Justice of Kazakhstan, in conformity with the local regulations, recorded in its registry of government contracts the existence of at least one American parent company (Turan-NV) for the Arys Concession.

17

81.    Pursuant to local regulations, prior to registering a foreign parent holding entity, the Ministry of Justice was to determine if the Government of Kazakhstan had interest to take over the rights of a foreign parent entity.  A foreign parent entity may be registered as the beneficial holder of the rights under a concession only if the Government declines to exercise its right of the first recusal.  When the Ministry of Justice declined to consummate the State's right of the first refusal and registered the American parent entity, it exercised the express "waiver", within the meaning of §1605.

82.    In fact, the Ministry was in receipt of numerous communications from North American investors.  The Ministry had the factual information and knowledge that American and Canadian investments were made in the Arys Concession.

83.    Furthermore, the clause of §1605(a)(3) applies, whereas "rights in property taken in violation of international law are in issue and that property".

84.    By way of a disclaimer, plaintiffs are also entitled to use the rights to seek arbitration in Washington, D.C. under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which Kazakhstan signed on July 23, 1992, in force for Kazakhstan since October 21, 2000.

85.    Plaintiffs have chosen a regular judicial proceeding for three reasons.  First, this action would benefit from discovery and depositions, which are not provided for as of right at the International Center for Settlement of Investment Disputes (ICSID) in Washington, D.C.   Second, Kazakhstan has treated arbitration awards as less significant for recognition, for example, refusing to honor an arbitration award for $125 million, cited above.  Third, certain Kazakh agencies applied to the Council of Ministers to rescind Kazakhstan's membership in that Convention, and Kazakhstan's commitment to abide by ICSID's awards is uncertain.

86.     With the disclaimer that plaintiffs are also entitled to the ICSID proceedings in Washington, D.C., plaintiffs indicate that the issue of arbitration and transferring the claims stated in this action to ICSID, subject to a stipulation of the parties herein, is not foreclosed.

## COUNT I. BREACH OF CONTRACT

87.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-77 above, as if pled herewith again with full force and effect.

88.     In 2001, the Ministry offered, among others, two concessions, encouraging foreign investments to be made in the Aral and Arys Concessions, whose term was 25 years.

89.     Thereupon, the Ministry unilaterally repudiated both Concessions. First, on or about July 7, 2005 it terminated the contract for the Aral Concession, reallocating it later to third parties. Then, on or about September 24, 2010 the Ministry terminated the Arys Concession, apparently also to reissue it to some other parties.

90.     Contrary to the 1993 Treaty, the Ministry used fundamentally flawed criteria for determining the investments into Kazakhstan, counting, in a self-serving manner, only the cash funds transferred onto accounts in Kazakhstan. The Ministry's approach essentially did not make any difference between the local investments, on the one hand, and foreign investments, on the other hand, which, for many objective reasons, justify longer time for performance. Investments in providing know-how and expertise were simply disregarded by the Ministry.

91.     The treatment by the Ministry of the agreements for both Concessions was in conflict with its obligations under the Treaty. Said 1993 Treaty included in the definition of investments covering a very broad range of activities, including, under its

Articles I: "intellectual property which includes, inter alia, rights relating to: inventions in all fields of human endeavor, industrial designs, trade secrets, know-how, and confidential business information, and trademarks, service marks, and trade names"…

92.     Likewise, the Ministry discarded the diversity of the forms of investments in light that a provision of Article I provides: "Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment."  In light of the financial markets' operations requiring the transfers of commercial papers, such provisions are fully compatible with the norms of the international private law, which the Ministry failed to recognize.

93.     The Ministry's repudiating both concession agreements had no justification because of the 'expropriation' clause.  The Ministry made no arrangements for the reimbursement of all investments made and compensation for anticipated commercial gain, on which the investors counted and which are mandatory.

94.     Plaintiffs are entitled to the restoration of the rights under both Concessions and for compensation of all damages caused by the termination of both Concessions.

### COUNT II.  VIOLATION OF RIGHTS UNDER 1993 INVESTMENT TREATY AND INTERNATIONAL PRIVATE LAW (EXPROPRIATION WITHOUT COMPENSATION)

95.     Plaintiffs incorporate by reference the allegations in Paragraphs 1-94 above, as if pled herewith again with full force and effect.

96.     Under Article III of the 1993 Treaty, "1. Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except…upon payment of prompt, adequate and effective compensation... Compensation shall be equivalent to the fair

market value of the expropriated investment immediately before the expropriatory action…be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable."

97.     The Ministry acted in blatant disregard to its obligations under the Treaty not to expropriate investments, at least without the due compensation based on a fair market valuation of the investments already made.

98.     The Ministry also reduced its obligations treating those in its narrowest possible way, disregarding the important factors, without which investments are nearly impossible.  For example, the Ministry disregarded the provisions in the 1993 Treaty that investments incorporate, under Article I, "(e) "associated activities" [which] include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities".

99.     Plaintiffs are entitled to the full compensation of the entire range of the investments made, as previewed under Article III of said Treaty.  That clause rises to the level of the U.S. government's protection to the extent of the provision under Article V that it, as a "Party [to the Treaty] may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law."

## COUNT III.  BREACH OF FIDUCIARY DUTIES

100.    Plaintiffs incorporate by reference the allegations in Paragraphs 1-77 above, as if pled herewith again with full force and effect.

101.    At all times relevant hereto, the Ministry was aware that it had fiduciary obligations to the foreign investors, by way of offering and then concluding agreements for exploration and production of oil and gas, proclaiming protection of foreign investments.

102.    For example, the Ministry was obligated not to burden investments by 'performance requirements' to be used to terminate the Concessions, as it did.  This conduct was in violation of the Treaty's Article II: "5. Neither Party shall impose performance requirements as condition of, establishment, expansion or maintenance of investments,…or which specify that goods or services must [be] purchased locally, or which impose any other similar requirements."

103.    Likewise, the Ministry was obligated to abide by the Treaty's Article II to the effect that: "2(a) Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security".  In violation of its express or implied fiduciary duties, the Ministry violated the obligations to provide the "full protection" and "security" to the investments already made.

104.    The Ministry elected to breach its fiduciary duties, to terminate the concession agreements, without any provisions for the reimbursement of investments made and for the compensation of damages.

105.    Plaintiffs are entitled to damages for the breach of the implied fiduciary duties by the Ministry, as deriving from the Concessions.

## COUNT IV.  UNJUST ENRICHMENT

106.    Plaintiffs incorporate by reference the allegations in Paragraphs 1-77 above, as if pled herewith again with full force and effect.

107.    By way of luring investments and thereupon obtaining assets and services, the Ministry secured a substantial benefit to itself and to Kazakhstan.  That included the investments made towards the Aral and Arys Concessions.

108.    The Ministry ended up with substantial seismic data accumulated, two oil wells drilled, preparation of further oil drilling accomplished.    Additionally, infrastructure necessary for the Concessions' implementing was created.  For all intents and purposes, as it turns out, the Ministry now believes that it just got all of this for free.  Additionally, investors secured indirect benefits for the Ministry and the State, by way of creating ad hoc jobs and employing experts and personnel in Kazakhstan.

109.    By violating the Treaty's Article III prohibiting expropriations without fair compensation and pursuant to other applicable law, the Ministry is liable for unjust enrichment.

110.    Plaintiffs are entitled to the compensation and to damages for the Ministry's unjust enrichment.

### COUNT V. MISREPRESENTATION

111.    Plaintiffs incorporate by reference the allegations in Paragraphs 1-77 above, as if pled herewith again with full force and effect.

112.    By making representations in the course of proposing the oil and gas concessions, the Ministry encouraged to make investments.  However, on information and belief, the Ministry did not disclose that, while luring western investments, it anticipated repudiating the two Concessions, which are at issue in this action.

113.    Likewise, the Ministry did not disclose that it did not intend to abide by the 1993 Treaty and by norms of the international private law, requiring reimbursements

or compensation, on the fair market terms, for the investments made, as well as for anticipated profits.

114.    Plaintiffs are entitled to damages caused by the misrepresentations and concealment by the Ministry.

## COUNT VI.  NEGLIGENCE

115.    Plaintiffs incorporate by reference the allegations in Paragraphs 1-77 above, as if pled herewith again with full force and effect.

116.    By virtue of the obligations undertaken by the Ministry towards the Aral and the Arys Concessions, the Ministry was obligated to undertake due diligence with regard to reviewing the information concerning the investments already made and those that were to be made in accordance with a certain schedule.

117.    However, the Ministry neglected to review the information about all investments or to recognize any investments other than those that can be shown as paid by cash transactions through the bank accounts in Kazakhstan.  Likewise, the Ministry was negligent not to abide by its obligations under the 1993 Treaty.

118.    Plaintiffs are entitled to damages caused by the Ministry's negligence when it failed to consider the information and documentation concerning the investments made into both Concessions and its own obligations.

## COUNT VII.  DECLARATORY RELIEF

119.    Plaintiffs incorporate by reference the allegations in Paragraphs 1-86 above, as if pled herewith again with full force and effect.

120.    The termination by the Ministry of both Concessions was unlawful and contrary to Kazakhstan's obligations under the 1993 Treaty between the USA and

Kazakhstan.  Plaintiffs are entitled to the judicial declaration that as to these two Concessions, the Ministry violated the 1993 Treaty.

121.    Plaintiffs and their assigns or designates should be declared as the lawful holders of the rights to at least the Arys Concession, to the extent of enforceability of such a declaration outside of Kazakhstan.  By means by such declaratory relief, the Ministry will be unable to reallocate the Arys Concession to new *bona fide* investors in the USA and elsewhere in Western jurisdictions.

122.    Even though Plaintiffs have not utilized arbitration proceeding for these claims, they are entitled to the declaration that the Ministry acted in the contravention of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which Kazakhstan signed on July 23, 1992, in force for Kazakhstan since October 21, 2000.

123.    Plaintiffs are also entitled to a judicial determination that the Ministry's decisions repudiating both Concessions without due compensation to investors were contrary to the established norms of the international private law.

<u>**PRAYERS FOR RELIEF**</u>

THEREFORE, Plaintiffs request this honorable Court to grant relief as follows:

1)    To compel defendant Ministry to rescind its decision on September 24, 2010, unilaterally terminating the agreement for the Arys Concession and to restore the Concession's status, the rights of the parties and their assigns and designates before that repudiation;

2)    To issue a declaratory judgment that the rescission of the Aral and Arys Concessions was unlawful under the norms of the international private law, including under the 1993 Treaty;

25

3)      In the event of a refusal to restore the agreements for the Arys Concession, to refund and repay all investments made in both Concessions, including all investments made into seismic and engineering works, supplies, equipment, legal expenses and costs, consulting with the total exceeding $30 million both in direct funding, value of goods and of services provided, with the exact total amounts to be proven at trial;

4)      To award interest accrued on all such investments since the time of the investments made till the date of the judgment;

5)      To award all anticipated profits from implementing the Aral and the Arys Concessions, with the estimated total exceeding $150 million, the exact amount to be proven through expert witnesses at trial;

6)      To award punitive damages against the Ministry, for the intentional concluding investment agreements on two Concessions without the intention to abide by those in good faith, expropriating investments without the mandatory due compensation;

7)       Attorneys' fees and costs, as well as such further relief that may be found just and fair.

      Respectfully submitted:

          Dated: December 8, 2010

              /s/

              GEORGE LAMBERT (D.C. Bar No. 979327)
              LAW OFFICES OF LEONARD SUCHANEK
              1025 Connecticut Avenue, #1000, NW
              Washington, D.C., 20036
              Tel. (202) 640 1897, Fax (202) 747 7797
              E-mail: lawdc10@aol.com
              Attorneys for Plaintiffs Turan Petroleum Inc.
              (Delaware), EnergyFund Inc. (D.C.) and Trustees for
              Trek Resources Inc.

## REQUEST OF JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand jury trial in this action.

Respectfully submitted:

Dated: December 8, 2010

/s/

GEORGE LAMBERT (D.C. Bar No. 979327)
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com
Attorneys for Plaintiffs Turan Petroleum Inc.
(Delaware), EnergyFund Inc. (D.C.) and Trustees for
Trek Resources Inc.

27