# TREATY BETWEEN
# THE UNITED STATES OF AMERICA AND
# THE REPUBLIC OF KAZAKHSTAN
# CONCERNING THE ENCOURAGEMENT
# AND RECIPROCAL PROTECTION OF INVESTMENT

Signed May 19, 1992; Entered into Force January 12, 1994

The United States of America and the Republic of Kazakhstan (hereinafter the "Parties");

Desiring to promote greater economic cooperation between them, with respect to investment by nationals and companies of one Party in the territory of the other Party;

Recognizing that agreement upon the treatment to be. accorded such investment will stimulate the flow of private capital and the economic development of the Parties;

Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maximum effective utilization of economic resources;

Recognizing that the development of economic and business ties can contribute to the well-being of workers in both Parties and promote respect for internationally recognized worker rights; and

Having resolved to conclude a Treaty concerning the encouragement and reciprocal protection of investment;

Have agreed as follows:

## ARTICLE I

1. For the purposes of this Treaty,

(a) "investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:

(i) tangible and intangible property, including movable and immovable property, as well as rights, such as mortgages, liens and pledges;

(ii) a company or shares of stock or other interests in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value, and associated with an investment;

(iv) intellectual property which includes, inter alia, rights relating to:

literary and artistic works, including sound recordings, inventions in all fields of human endeavor, industrial designs, semiconductor mask works, trade secrets, know-how, and confidential business information, and trademarks, service marks, and trade names; and

(v) any right conferred by law or contract, and any licenses and permits pursuant to law;

(b) "company" of a Party means any kind of corporation, company, association, enterprise, partnership, or other organization, legally constituted under the laws and regulations of a Party or a political subdivision thereof whether or not organized for pecuniary gain, or privately or governmentally owned or controlled;

(c) "national," of a Party means a natural person who is a national of a Party under its applicable law;

(d) "return" means an amount derived from or associated with an investment, including profit; dividend; interest; capital gain; royalty payment; management, technical assistance or other fee; or returns in kind;

(e) "associated activities" include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities; and the purchase of foreign exchange for imports;

2. Each Party reserves the right to deny to any company the advantages of this Treaty if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third country with which the denying Party does not maintain normal economic relations.

3. Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.

## ARTICLE II

1. Each Party shall permit and treat investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable, subject to the right of each Party to make or maintain exceptions falling within one of the sectors or matters listed in the Annex to this Treaty. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware concerning the sectors or matters listed in the Annex. Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Annex, and to limit such exceptions to a minimum. Any future exception by either Party shall not apply to investment existing in that sector or

matter at the time the exception becomes effective. The treatment accorded pursuant to any exceptions shall, unless specified otherwise in the Annex, be not less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country.

2. (a) Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.

(b) Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Articles VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a Party has had or has exercised the opportunity to review such measure in the courts or administrative tribunals of a Party.

(c) Each Party shall observe any obligation it may have entered into with regard to investments.

3. Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, administering or advising on the operation of an investment to which they, or a company of the first Party that, employs them, have committed or are in the process of committing a substantial amount of capital or other resources.

4. Companies which are legally constituted under the applicable laws or regulations of one Party, and which are investments, shall be permitted to engage top managerial personnel of their choice, regardless of nationality.

5. Neither Party shall impose performance requirements as condition of, establishment, expansion or maintenance of investments, which require or enforce commitments to export goods produced, or which specify that goods or services must purchased locally, or which impose any other similar requirements.

6. Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.

7. Each Party shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments.

8. The treatment accorded by the United States of America to investments and associated activities of nationals and companies of the Republic of Kazakhstan under the provisions of this Article shall in any State, Territory or possession of the United States of America be no less favorable than the treatment accorded therein to investments and associated activities of nationals of the United States of America resident in, and companies legally constituted under the laws and regulations of other States, Territories or possessions of the United States of America.

9. The most favored nation provisions of this Treaty shall not apply to advantages accorded by either Party to nationals or companies of any third country by virtue of:

(a) that Party's binding obligations that derive from full membership in a free trade area or customs union; or

(b) that Party's binding obligations under any multilateral international agreement under the framework of the General Agreement on Tariffs and Trade that enters into force subsequent to the signature of this Treaty.

10. The Parties acknowledge and agree that "associated" activities, include without limitation, such activities as:

(a) the granting of franchises or rights under licenses;

(b) access to registrations, licenses, permits and other approvals (which shall in any event be issued expeditiously);

(c) access to financial institutions and credit markets;

(d) access to their funds held in financial institutions;

(e) the importation and installation of equipment necessary for the normal conduct of business affairs, including but not limited to, office equipment and automobiles, and the export of any equipment and automobiles so imported;

(f) the dissemination of commercial information;

(g) the conduct of market studies;

(h) the appointment of commercial representatives, including agents, consultants and distributors and their participation in trade fairs and promotion events;

(i) the marketing of goods and services, including through internal distribution and marketing systems, as well as by advertising and direct contact with individuals and companies;

(j) access to public utilities, public services and commercial rental space at nondiscriminatory prices, if the prices are set or controlled by the government; and

(k) access to raw materials, inputs and services of all types at nondiscriminatory prices, if the prices are set or controlled by the government.

(l) payment for goods and services in local foreign currency.

## ARTICLE III

1. Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except: for public purpose; in a nondiscriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article II(2). Compensation shall be equivalent to the fair market value of the expropriated investment

immediately before the expropriatory action was taken or became known, whichever is earlier; be calculated in a freely usable currency on the basis of the prevailing market rate of exchange at that time; be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable.

2. A national, or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any associated compensation, conforms to the principles of international law.

3. Nationals or companies of either Party whose investments suffer losses in the territory of the other Party owing to war or other armed conflict, revolution, state of national emergency, insurrection, civil disturbance or other similar events shall be accorded treatment by such other Party no less favorable than that accorded to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, as regards any measures it adopts in relation to such losses.

## ARTICLE IV

1. Each Party shall permit all transfers related to an investment to be made freely and without delay into and out of its territory. Such transfers include: (a) returns; (b) compensation pursuant to Article III; (c) payments arising out of an investment dispute; (d) payments made under a contract, including amortization of principal and accrued interest payments made pursuant to a loan agreement; (e) proceeds from the sale or liquidation of all or any part of an investment; and (f) additional contributions to capital for the maintenance or development of an investment.

2. Transfers shall be made in a freely usable currency at the prevailing market rate of exchange on the date of transfer with respect to spot transactions in the currency to be transferred.

3. Notwithstanding the provisions of paragraphs 1 and 2, either Party may maintain laws and regulations (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law.

## ARTICLE V

The Parties agree to consult promptly, on the request of either, to resolve any disputes in connection with the Treaty, or to discuss any matter relating to the interpretation or application of the Treaty.

## ARTICLE VI

1. For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute for resolution:

(a) to the courts or administrative tribunals of the Party that in a Party to the dispute; or

(b) in accordance with any applicable, previously agreed dispute-settlement procedures; or

(c) in accordance with the terms of paragraph 3.

3. (a) Provided that the national or company concerned has not . submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration:

(i) to the International Centre for the Settlement of Investment Disputes ("Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 ("ICSID Convention"), provided that the Party is a Party to such Convention; or

(ii) to the Additional Facility of the Centre, if the Centre is not available; or

(iii) in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL); or

(iv) to any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.

(b) Once the national or company concerned has so consented, either Party to the dispute may initiate arbitration in accordance with the choice so specified in the consent.

4. Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for:

(a) written consent of the parties to the dispute for purposes of Chapter II of the ICSID Convention (Jurisdiction of the Centre) and for purposes of the Additional Facility Rules; and

(b) an "agreement in writing," for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ("New York Convention").

5. Any arbitration under paragraph 3(a)(ii), (iii) or (iv) of this Article shall be held in a state that is a Party to the New York Convention.

6. Any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement.

7. In any proceeding involving an investment dispute, a Party shall not assert, as a defense, counterclaim, right of set-off or otherwise, that the national or company concern ad has received or will receive, pursuant to an insurance or guarantee contract, indemnification or other compensation for all or part of its alleged damages.

8. For purposes of an arbitration held under paragraph 3 of this Article, any company legally constituted under the applicable laws and regulations of a Party or a political subdivision thereof but that, immediately before the occurrence of the event or events giving rise to the dispute, was an investment of nationals or companies of the other Party, shall be treated as a national or company of such other Party in accordance with Article 25(2)(b) of the ICSID Convention.

## ARTICLE VII

1. Any dispute between the Parties concerning the interpretation or application of the Treaty which is not resolved through consultations or other diplomatic channels, shall be submitted, upon the request of either Party, to an arbitral tribunal for binding decision in accordance with the applicable rules of international law. In the absence of an agreement by the Parties to the contrary, the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL), except to the extent modified by the Parties or by the arbitrators, shall govern.

2. Within two months of receipt of a request, each Party shall appoint an arbitrator. The two arbitrators shall select a third arbitrator as Chairman, who is a national of a third State. The UNCITRAL Rules for appointing members of three member panels shall apply mutatis mutandis to the appointment of the arbitral panel except that the appointing authority referenced in those rules shall be the Secretary General of the Centre.

3. Unless otherwise agreed, all submissions shall be made and all hearings shall be completed within six months of the date of selection of the third arbitrator, and the Tribunal shall render its decisions within two months of the date of the final submissions or the date of the closing of the hearings, whichever is later.

4. Expenses incurred by the Chairman, the other arbitrators, and other costs of the proceedings shall be paid for equally by the Parties. The Tribunal may, however, at

its discretion, direct that a higher proportion of the costs be paid by one of the Parties.

ARTICLE VIII

The provisions of Articles VI and VII shall not apply to a dispute arising (a) under the export credit, guarantee or insurance programs of the Export-Import Bank of the United States or (b) under other official credit, guarantee or insurance arrangements pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE IX

This Treaty shall not derogate from:

(a) laws and regulations, administrative practices or procedures, or administrative or adjudicatory decisions of either Party;

(b) international legal obligations; or

(c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization,

that entitle investments or associated activities to treatment more favorable than that accorded by this Treaty in like situations.

ARTICLE X

1. This Treaty shall not preclude the application by either Party of measures necessary for the maintenance of public order, the fulfillment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests.

2. This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

ARTICLE XI

1. With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investment of nationals and companies of the other Party.

2. Nevertheless, the provisions of this Treaty, and in particular Article VI and VII, shall apply to matters of taxation only with respect to the following:

(a) expropriation, pursuant to Article III;

(b) transfers, pursuant to Article IV; or

(c) the observance and enforcement of terms of an investment agreement or authorization as referred to in Article VI (1) (a) or (b), to the extent they are not

subject to the dispute settlement provisions of a Convention for the avoidance of double taxation between the two Parties, or have been raised under such settlement provisions and are not resolved within a reasonable period of time.

ARTICLE XII

This Treaty shall apply to the political subdivisions of the Parties.

ARTICLE XIII

1. This Treaty shall enter into force thirty days after the date of exchange of instruments of ratification. It shall remain in force for a period of ten years and shall continue in force unless terminated in accordance with paragraph 2 of this Article. It shall apply to investments existing at the time of entry into force as well as to investments made or acquired thereafter.

2. Either Party may, by giving one year's written notice to the other Party, terminate this Treaty at the end of the initial ten year period or at any time thereafter.

3. With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty otherwise applies, the provisions of all of the other Articles of this Treaty shall thereafter continue to be effective for a further period of ten years from such date of termination.

4. The Annex shall form an integral part of the Treaty.

IN WITNESS WHEREOF, the respective plenipotentiaries have signed this Treaty.

DONE in duplicate at Washington, this nineteenth day of May, 1992 in the English and Russian languages, both texts being equally authentic. A Kazakh language text shall be prepared which shall be considered equally authentic upon an exchange of diplomatic notes confirming its conformity with the English language text.

FOR THE UNITED STATES OF AMERICA:
FOR THE REPUBLIC OF KAZAKHSTAN:

ANNEX

1. The United States reserves the right to make or maintain limited exceptions to national treatment, as provided in Article II, paragraph 1, in the sectors or matters it has indicated below:

air transportation; ocean and coastal shipping; banking; insurance; government-grants; government insurance and loan programs; energy and power production; custom house brokers; ownership of real property; ownership and operation of broadcast or common carrier radio and television stations; ownership of shares in the Communications Satellite Corporation; the provision of common carrier telephone

and telegraph services; the provision of submarine cable services; use of land and natural resources; mining on the public domain; maritime services and maritime-related services; and primary dealership in United States government securities.

2. The United States reserves the right to make or maintain limited exceptions to most favored nation treatment, as provided in Article II, paragraph 1, in the sectors or matters it has indicated below:

ownership of real property; mining on the public domain; maritime-related services; and primary dealership in United States government securities.

3. The Republic of Kazakhstan reserves the right to make or maintain limited exceptions to national treatment, as provided in Article II, paragraph 1, in the sectors or matters it has indicated below:

ownership of land, its subsoil, water, plant and animal life, and other natural resources; ownership of real estate (during the transition period to a market economy); ownership of control of television and radio broadcasting; air transportation; and, preparation of stocks and bond notes issued by the Govenment of Kazakhstan.